[Crim. No. 1328.   Third Appellate District.—February 16, 1934.]

THE PEOPLE, Respondent, v. GEORGE JONES, Appellant.

William E. Ferriter for Appellant.

U. S. Webb, Attorney-General, and Jess Hession, Deputy Attorney-General, for Respondent.

PLUMMER, J.—In this action the defendant was jointly indicted with Tony Cardinale, Ralph Thatcher, Charles F. Gingg and F. B. Hoyt (otherwise known as Bernard Felts), tried and found guilty of two robberies, and also the offense of murder.   The verdicts returned against the defendant George Jones found him guilty of robbery on one of the counts in the second degree; guilty of robbery on one of the counts in the first degree; and guilty of murder in the first degree, with the punishment fixed at life imprisonment. The defendant Jones appears alone upon this appeal from the judgments pronounced upon the verdicts finding him guilty of the offenses just named.   Upon this appeal the appellant contends the evidence is insufficient to support the verdict as to counts 1 and 2.   No contention is made

as to the sufficiency of the testimony to support the verdict finding the defendant guilty as charged in count 3.

The record shows the following facts: That on or about the twentieth day of February, 1933, the defendant Gingg and one Mareck, at a meeting in San Francisco, planned to visit the city of Santa Rosa for the purpose of committing robberies. At the time of making these plans the defendant Tony Cardinale was also present, but we do not find in the record that he participated in the conference.

The defendant Jones, prior to this date, had been, and was at the date mentioned, engaged in the grocery business in San Francisco. As such grocer he became acquainted with Mareck and others of the group, through the delivery of groceries to the Mareck home in San Francisco. In delivering groceries Jones had visited the Mareck home some ten or fifteen times, and became known by the name of "Clicker" through his manner of handling a gun shown to him. At the Mareck home the defendant met Cardinale and another man known as Slim Hoyt. On the night of February 25, 1933, Mareck, his wife, and Slim Hoyt left San Francisco and proceeded to Santa Rosa, going to the apartment occupied by the defendants Gingg and Thatcher at 124 West Eighth Street in Santa Rosa. On the following day Tony Cardinale and the appellant, George Jones, arrived in Santa Rosa, going to the apartment just mentioned. The first robbery was committed at a place known as the "Dorothy Leonard" place, also called "101 Ranch," situate a short distance south of the city of Santa Rosa. This robbery was committed on or about 8 o'clock on the night of February 26, 1933. As stated, no contention is made that the evidence is not sufficient to support the verdict of guilty as to this offense.

After committing this robbery all of the defendants returned to 124 West Eighth Street in Santa Rosa. Within a short time after such return Mareck and Gingg left the apartment and went to a speakeasy adjoining the Buon Gusto Hotel at No. 513 Adams Street, to which place they gained entrance. Gingg and Mareck then returned to the apartment at 124 West Eighth Street, and thereafter all of the defendants, excepting Thatcher, left the apartment and proceeded down to the vicinity of the speakeasy at 513 Adams Street. The purpose, as shown by the record, was

to rob the place, and also secure the contents of the slot-machines there being operated. The defendant Jones drove his car to a place near the speakeasy at 513 Adams Street, having with him Tony Cardinale. The other defendants proceeded to the designated place in a car driven by the defendant Gingg. Upon arriving at a point near 513 Adams Street the defendants got out of the respective cars in which they had been riding. Mareck, Cardinale and Hoyt went up the alley about ninety feet to the speakeasy in question. Mareck, Cardinale and Hoyt entered the speakeasy and proceeded to rob the people present. Someone made a remark that the night watchman would soon be coming. The defendant Hoyt immediately left the place and encountered the night watchman named Carlos R. Garrick, whom he then and there shot and killed.

The defendant Jones claims that after driving to the place near the speakeasy he abandoned the enterprise, and therefore was not responsible for any offense or offenses committed by the other parties. All the offenses of which the defendant was found guilty were committed within a period of four hours on the night of February 26, 1933.

We do not deem it necessary to set out all the testimony included within the appellant's briefs, as the following portion of the transcript printed in the respondent's brief we think amply supports the verdict of the jury that the defendants were engaged in a conspiracy to rob, went to the city of Santa Rosa for that purpose, and proceeded immediately to carry out their criminal designs.

As to the robbery of the place known as "101 Ranch," we set forth the following portions of the cross-examination of the defendant: "Q. Later, Mareck asked you to go to the 101 Ranch? A. Yes, sir, he did. Q. And Tony Cardinale gave you a gun? A. He did. Q. Did he say anything about why he was giving you a gun? A. There was not anything for me to say; Tony said it himself. Q. When you took the gun what did you say? A. I don't remember saying anything. Q. You didn't say, 'What need is there for me to take this gun?' Didn't say anything like that? A. I took it; didn't say anything at all; nothing for me to say."

Following this incident the appellant went with the other defendants and proceeded to take part in the robbery as

charged in the indictment. As to the circumstances attending the robbery of the speakeasy and the shooting that there occurred, the defendant testified: "We left the apartment house and came down First Street; Gingg was ahead leading the way; I followed. I stopped my car directly in front of his (Gingg's car). Mareck, Slim Hoyt and Tony Cardinale went down to the alley in the order named; I got out of my car as soon as they went out of sight in the alley, and ran as fast as I could. I heard shots. I believed that Mareck and the boys were back there shooting. I don't remember having any conversation with Frank Gingg in front of the alley. When I stopped running I ducked down behind the picket fence. I saw a car that looked like my car, pass, so I turned up the street here and went to the apartment." The defendant Gingg, as to this incident, testified as follows: "Q. What did you do when you parked your car in front of the alley-way or passage-way to 513 Adams street? A. I stopped the car there—didn't stop the car—just stopped there and let Mareck off, and they went in and the light went off in the alley. Q. How long after you parked your car there did the lights go off? A. Right away. Q. How long did you remain there? A. The heavy-set fellow was there; he didn't go in with the rest of them. Q. What do you mean by the heavy-set fellow? A. The man known as Jones; I didn't know his name at that time. He said something about the lights going off; he said, 'Looks like something is going on there; I know there is; I'm getting out,' I left then. Q. What, if anything, became of the car in front of your car? A. I couldn't say. Q. What, if anything, did you see relative to this short, stout man you described? A. I don't know what became of him, I didn't see him any more."

The appellant, Jones, further stated in one of his conversations as follows: "Q. Did you stay in your car, or did you get out? A. I stayed in my car about three minutes until they all got out. Q. Then what did you do? A. I left—ran from the spot as hard as I could; knew something terrible was going to happen."

The record also contains testimony of independent witnesses who saw persons running after the shooting, dressed exactly as the appellant was dressed at the time of the commission of the offense. The appellant also described

the way he ran from the speakeasy to the apartment and found that his car had been driven back to the apartment. This testimony, however, we deem immaterial as being simply a circumstance occurring after the offense and the way in which the appellant got away from the scene of the robbery and murder.

The facts we have set forth we think clearly justified the jury in coming to the conclusion that the defendants had been engaged in a concerted scheme to commit different robberies in the city of Santa Rosa. To be sure no one testified that the defendants, by word of mouth, entered into a conspiracy, but such testimony is not necessary to establish the fact of a concerted scheme.

In the case of *People* v. *Burke,* 18 Cal. App. 72 [122 Pac. 435], we find the following statement which clearly sets forth the rule of law in relation to the evidence necessary to establish a conspiracy. (We quote from the syllabus): "In proving a conspiracy it need not be shown that the parties actually came together and agreed to enter into and pursue a common design. The existence of the assent of minds which is involved in a conspiracy may be, and from the secrecy of the crime usually must be inferred by the jury from the proof of the facts and circumstances which taken together, apparently indicate that they are mere parts of some complete whole." To the same effect is the case of *People* v. *Schmidt,* 33 Cal. App. 426 [165 Pac. 555]; also, *People* v. *Revley,* 67 Cal. App. 553 [227 Pac. 957].

In 5 California Jurisprudence, page 497, the rule as to the requisite proof is thus stated: "It requires at least two persons to conspire. But while this is so, and the common design is the essence of the charge, it is not necessary to constitute a conspiracy that two or more persons should meet together, and enter into an explicit or formal agreement for an unlawful scheme, or that they should directly, by words or in writing, state what the unlawful scheme was to be, and the detail of the plans or means by which the unlawful combination was to be made effective. It is sufficient if they, in any manner, or through any contrivance, positively or tacitly come to a mutual understanding to accomplish a common and unlawful design."

Here, the testimony in the record, in addition to what we have quoted, shows that the defendants became acquainted

with each other in the city of San Francisco, where they resided; that they left the city of San Francisco and arrived in Santa Rosa at about the same time, or within a very short time; that they met at 124 West Eighth Street. That a common meeting place must have been agreed upon is evident from the fact they all met at the place just mentioned. A short time after the meeting they proceeded to rob the place known by the two names of 101 Ranch and Dorothy Leonard's. They then came back to the apartment house; two of the defendants visited the speakeasy at 513 Adams Street, returned to the apartment house, and then all of the defendants, excepting one, left in two automobiles and drove down to a place near the speakeasy. Three of the defendants went into the speakeasy for the purpose of robbing the place. The night watchman, appearing upon the scene, was shot and killed. The appellant drove to the designated place in his own car, and accompanying him was one of the defendants who actually entered the speakeasy. The appellant's testimony then is that he formed the design and carried out the purpose of abandoning the enterprise, left his car standing at the designated spot and ran away on foot. Having participated in the intended robbery up to the point where the other defendants entered the speakeasy, he had aided and abetted, by the presence and use of his car, in the commission of the offense therein committed.

The appellant in the first robbery went armed. Whether he was armed at the time of going to the speakeasy does not appear from the record, but he knew his co-defendants were armed, and just as held in substance in the case of *People* v. *Thomas,* 135 Cal. App. 654 [27 Pac. (2d) 765], the defendant was responsible for all the consequences that followed attendant upon the robbery of the speakeasy. It is there said: "The question of the scope of the conspiracy was therefore essentially a question for the jury to determine. As was said in *People* v. *Kauffman,* 152 Cal. 331, at page 335 [92 Pac. 861, 863]: 'If, as a matter of law, it can be said that the criminal combination embraced no more than this contemplated burglary, and that the shooting of Robinson was not within the reasonable and probable consequences of the common unlawful design, it would follow that no case was made out against the appellant. But

whether or not the act committed was the ordinary and probable effect of the common design or whether it was a fresh and independent product of the mind of one of the conspirators, outside of, or foreign to, the common design, is a question of fact for the jury. (*Bowers* v. *State,* 24 Tex. App. 542 [5 Am. St. Rep. 901, 7 S. W. 247]; *Spies* v. *People,* 122 Ill. 1 [3 Am. St. Rep. 320, 12 N. E. 865, 17 N. E. 898].)   And, if there be any evidence to support the finding of the jury on this question, its determination is conclusive.'   In *People* v. *Woods,* 147 Cal. 265, at page 272 [81 Pac. 652, 655, 109 Am. St. Rep. 151], the court said: ' . . . The jury would have been justified in concluding that a part of the common design was to resist arrest by the use of the pistols with which the defendants armed themselves.' "

Having participated in the robbery of the 101 Ranch, otherwise known as the Dorothy Leonard place, and within a very limited time thereafter proceeded with his automobile to the speakeasy, conveying one of the defendants, we do not deem it necessary to comment upon the appellant's testimony that he withdrew from the enterprise and ran away after three of his co-defendants had entered the speakeasy.   We think he had gone too far in aiding and abetting the common undertaking to warrant any jury in concluding that he should be held not guilty.

The judgment and order are affirmed.

Thompson, J., and Pullen, P. J., concurred.