[Crim. No. 4549. In Bank. Feb. 7, 1945.]

THE PEOPLE, Respondent, v. McELWEE HARPER et al., Appellants.

Raymond W. Shellooe for Appellant Bolden.

No appearance for Appellant Harper.

Robert W. Kenny, Attorney General, and David K. Lener, Deputy Attorney General, for Respondent.

SCHAUER, J.—These are automatic appeals (Pen. Code, § 1239(b)) from judgments sentencing each defendant to death, after verdicts finding them guilty of murder in the first degree without recommendation as to penalty, and, as to defendant Bolden, from an order denying his motion for a new trial. Each defendant was represented at the trial by able counsel but defendant Harper is without benefit of counsel on the appeal. As to him the proceedings appear to have been regular in all respects, we have discovered no prejudicial error, and his testimony alone, voluntarily given, amply supports the verdict of the jury against him. Defendant Bolden, whose counsel presses his appeal, vigorously contends that the evidence is insufficient to connect him with the crime of murder and that the trial court therefore erred in denying his motions for an advised verdict and for a new trial. An examination of the record discloses that the evidence is legally sufficient to support the verdict against him and that the trial court did not err in denying his motions. The judgments as to each defendant and the order denying Bolden's motion for a new trial must therefore be affirmed.

The record depicts one of the foulest and most aggravated first degree murder cases in the history of this state. On Sunday morning, November 21, 1943, the defendants prevailed upon the kindness and generosity of their victim, one W. E. Bennett, who was a fellow employee and acquaintance of Harper, to drive them in his automobile to a lonely spot some ten miles out in the country from the city of Salinas on the pretext of taking a supply of gasoline (they actually took with them a can containing a gallon of gasoline) to an imaginary friend assertedly stranded in a car out of fuel. There they robbed Bennett of his money and *after the robbery,* according to the testimony of defendant Bolden himself, as well as the statement of Harper, with an iron pinch bar taken along expressly for the purpose they assaulted and apparently endeavored to kill the man who had befriended them, dragged him some fifty feet off the road into a field, left him unconscious and for dead, and returned to Salinas. The evidence amply establishes that both defendants then believed that their victim was probably dead, although they were not positive as to the fact. Within the hour one or both of them

returned to the scene of the crime "to see about the body," according to Bolden; to retrieve the can of gasoline which they had inadvertently left and feared would identify them, according to Harper.

There is a substantial conflict in the evidence, as appears in more detail later herein, as to whether Harper alone or both Harper and Bolden made this return trip. In any event the one or ones who returned found that the victim was not dead and immediately completed the grisly project.

Bolden's testimony indicates that Harper returned alone, while Harper testified that Bolden also returned and that it was he who did the actual killing. (The testimony of a doctor at the trial declares that the wounds inflicted on Bennett in the first assault would not necessarily have proved fatal if he had received timely and proper medical attention.) Certain circumstances seem to corroborate Bolden on this point while others tend to corroborate Harper. Among the circumstances tending to corroborate Harper are the facts that Bolden from the inception of the conspiracy admittedly showed much concern that there be no "kick" or "squawk" arising from the projected crime; obviously he desired to avoid detection and apprehension; he inquired of Harper, prior to starting out on the criminal mission, as to whether Harper had gloves and as to whether there was another pair available for himself (Bolden); Harper did wear gloves; Bolden did not, but on returning secured Harper's promise to wipe off the car to remove fingerprints. The blows on the first assault, admittedly struck by Harper, were only two in number, were applied to the face or side of the head of the victim, and did not crush the skull fatally, while those of the second assault were three in number, applied to the back of the head, and each crushed the skull sufficiently to have caused death. The jury may have believed that different hands wielded the pinch bar on the second occasion. Bolden also was shown by the testimony of an unimpeached and disinterested witness, one McGee, to have been active in promoting and planning the project to rob Bennett. McGee testified that on the morning of the day of the crime Bolden approached him and said, "Will you go with this Nigger and help roll that petty [white man] for some money?"; that he replied that he "was not going to do that and tried to get him not to do it." Bolden admitted in his testimony that he had asked McGee to assist in robbing Bennett. As to the origination of

the plan Bolden testified that Harper solicited him to participate in it but Harper testified that Bolden first suggested, four days before the crime, that they "make a piece of money" and sought Harper's assistance in *selecting a victim* who would have considerable money. This assistance Harper apparently readily furnished, selecting, as previously mentioned, his accommodating fellow employee, Bennett, but the fact that on the very morning of the crime Bolden was still trying to procure someone other than Harper, i. e., the witness McGee, to assist in the actual perpetration of the projected crime strongly suggests that Bolden, rather than Harper, was the dominating leader in the enterprise and that Bolden was not sure he could depend upon Harper to aid in carrying out all the details of his plan. The domination of the project by Bolden rather than by Harper is further evidenced by his own (Bolden's) testimony as follows: "Q. Did you and Harper, before you met McGee, talk about getting McGee into the deal? A. No, that was my idea. Q. You hadn't said a word to Harper? A. No." Obviously the jury could conclude that the project was Bolden's and that he dominated it so completely that he felt free to invite others to participate without first consulting Harper.

In support of his claim that he did not accompany Harper on the second trip to the scene of the crime Bolden refers to the testimony of certain witnesses as to times and places where he was seen on the day in question. As to this the most that can be said in favor of Bolden's contention is that the evidence is in serious conflict respecting the testimonies of the several witnesses who testified as to the respective times at which various events happened, but this conflict was for the determination of the jury and is not for the reviewing court. In our opinion from the evidence before the jury they were warranted in concluding that, insofar as the element of time entered into the case, it was not a physical impossibility for Bolden to have made the second trip to the scene of the crime before leaving with Thornton (a taxi driver) for Moss Landing "somewhere about 12 o'clock." However, as appears further on herein, it was not essential for the jury's finding of guilt as to Bolden that they believe that he accompanied Harper on the return trip.

Bolden next contends that there is no testimony except that of his accomplice, Harper, to connect him with Harper's

return trip to "see about the body" or secure the can of gasoline, on which trip the coup de grace was administered to Bennett after it was discovered that he had not died from the first beating; that Harper's testimony as to the events occurring on the second trip is entirely without corroboration; and that we must therefore accept Bolden's testimony that he and Harper parted company when they first returned to Salinas. For the purposes of this opinion we can accept such contention, regardless of whether it is sound in law or fact. But we cannot accept Bolden's further contention that as a matter of law two distinct crimes were committed; that the first crime (the robbery of and assault upon Bennett) was in pursuance of the conspiracy of the defendants but that the second crime (the murder of Bennett) was committed by Harper solely as an independent offense after the purpose of defendants' plan had been accomplished and the conspiracy had terminated.

Such latter contention necessarily falls because, first, the evidence is ample to sustain a finding that the two defendants deliberately entered into a conspiracy to rob Bennett and kill him so that he could not make a "kick" or "squawk" and, second, an unbroken line of authorities in this state holds that upon proof of a conspiracy to commit a crime and proof of the commission of an act reasonably and naturally related to the crime, "whether or not the act committed was the ordinary and probable effect of the common design or whether it was a fresh and independent product of the mind of one of the conspirators, outside of, or foreign to, the common design, is a question of fact for the jury." (*People* v. *Kauffman* (1907), 152 Cal. 331, 335 [92 P. 861]; *People* v. *Jones* (1934), 136 Cal.App. 722, 727 [29 P.2d 902]; *People* v. *King* (1938), 30 Cal.App.2d 185, 202 [85 P.2d 928]; see Shepard's California Citations for additional cases.)

From a review of the evidence there can be no question but that Harper and Bolden entered into a conspiracy to rob Bennett of his money. Likewise there can be no serious question but that the evidence fully supports the jury's implied finding that the conspiracy contemplated killing Bennett so that he could not "kick" or "squawk." The defendants took the iron pinch bar with them on the first trip to the scene of the crime; they did not need that weapon to perpetrate a mere robbery; they did not in fact use it until after the money was taken; they used it then in pursuance of their common design to kill Bennett and thought that they had

killed him. Bolden's own testimony that Harper "was going back to see about the body" is ample proof' of his belief in that regard. The jury may have reasoned that it did not seem likely that he would have used the term "body" if he had not thought that Bennett was dead and that, if he did entertain a doubt as to the fact, it was probable that he contemplated that Harper was going back to make sure of the killing, as, if the plan had been merely to render Bennett unconscious for a time sufficient to permit the defendants to get away from the locality, Harper should have been availing himself immediately of the opportunity to flee rather than returning to "see about the body." Bolden was not surprised later when he was told that Bennett was dead. In his statement to the district attorney which was read in evidence he described the actual taking of the money. After Harper (who is referred to by Bolden as "Mac") had demanded Bennett's money Bolden stated that "He [Bennett] handed Mac some small bills—I don't know how much it was. I never did see how much it was. He told Mac that's all he had. Mac said he knew better. He told Mac about the money belt—Mac knew he had a money belt on, and Mac snatched it off from him. Then he told Mac, he said, 'Mac, you'll get yourself in trouble.' " The statement continues:

"Q. What happened to the money belt? A. Mac taken it and handed it to me.

"Q. What did you do with it? A. I held it.

"Q. What did Mac do then? A. Mac walked around in front of the car and came back with a crow bar which he got out of the back of the car.

"Q. You mean pinch bar, with a curve on the end? A. Yes.

"Q. What happened then? A. Mac hit him.

"Q. What next? A. He hit him twice altogether. He hit right between the ear. He hit him the second time. I said, 'Don't kill him, Mac.' He said, 'He's not dead. I'm not going to kill him.'. . .

"Q. You were pretty sure he was dead at that time, weren't you? A. I don't know whether he was dead or not. . . .

"Q. Did you have any further conversation with Harper as to whether or not he was dead? A. I said, 'Mac, you've killed him.' He said, 'No.' He said, 'I'll be back to see about it.' . . .

"Q. After you came back to Salinas, did you wipe the fingerprints off the car? A. No, sir.

"Q. Harper was wearing gloves at all times, wasn't he? A. He sure was.

"Q. What conversation did you have in regard to fingerprints? A. He said, 'I don't want no fingerprints, so I am going to wipe the whole car down.' . . .

"Q. Did he [Harper] tell you about Bennett when you were with him in Imperial County? A. He told me about him in Los Angeles.

"Q. What did he tell you? A. He told me that he was dead, and they was looking for him.

"Q. Didn't he give you the details of how he came to his death? A. No, sir, he did not. He said he was dead and they were looking for him.

"Q. Didn't you know about the second trip out to this place? A. No, sir, I did not.

"Q. Didn't you tell him that you were under the impression that he hadn't been killed? A. I didn't ask him anything; that's what he told me. I didn't know."

When called as a witness in his own behalf Bolden gave a somewhat different account of the events at the time of the robbery and first assault. He said that Harper first pulled him (Bolden) and then Bennett from the automobile, demanded Bennett's money, received some, insisted that Bennett had more, "Then he [Harper] walks around in front of the car to the right hand side and got the pinch bar and Bennett and I were just standing there. . . . Then he snatched the money belt off Mr. Bennett. . . . It was in here somewhere and he had on coveralls and he unbuttoned them to a certain extent." It will be noted that the above quoted testimony indicates that the money belt was taken *after* Harper had procured the pinch bar from the car but on cross-examination the witness reverted to the version given in his earlier statement to the district attorney. The transcript shows the following:

"Q. Did he take the money before he went around the car to get the pinch bar? A. All of the money I've seen was taken before the licking.

"Mr. Brazil: All of the money you've seen? A. Yes.

"Q. Did that include the money belt? A. Yes, that includes the money belt.

"Q. So you had gotten the money belt and small bills

before Harper went around the car to get the pinch bar?
A. Yes.''

Bolden apparently endeavored to portray himself to the
jury as a distinterested and perhaps unwilling participant
in the enterprise. As mentioned before he testified that Harper
pulled him, as well as Bennett, from the automobile. And in
regard to the money first taken from Bennett the record
shows: ''Q. What did Bennett do with that money? A.
Handed it to Harper. Q. What did Harper do with it? A. I
really don't know, I didn't pay any attention.'' He did admit,
however, that of the two hundred dollars in the money belt
he received one hundred as his share. The jury may not have
found it easy to believe that Harper would have been so gen-
erous to Bolden if the former had actually been as dominant
and the latter as subservient and disinterested as the above
related testimony seems designed to indicate.

The jury may also have found unconvincing the testimony
of Bolden relating to what occurred immediately after Harper
demanded more money from Bennett and was walking around
the car to procure the pinch bar and returning around the
car with the weapon. He claimed that neither he nor Ben-
nett did or said anything during that period. In particular
the following quotation is illustrative of his story:

''Q. Well, what did he [Bennett] say? A. He didn't say
anything.

''Q. Didn't he say anything? A. He didn't say anything,
nor did I.

''Q. Just stood there like a lamb ready to be shorn, is
that right? A. Yes.

''Q. Didn't try to get away? A. Just stood there. . . .

''Q. Did Bennett try to defend himself in any way? A. No,
he never did.

''Q. Did he say anything? A. No, he didn't, not then.

''Q. When did he say anything? A. He said something
before Harper walked around the car, he said, 'You'll get
in trouble, Mac,' just like that.''

Returning now to events which preceded the crime, Bolden
was asked the following questions and answered as indicated:

''Q. [relative to conversation with Harper]. What did you
say? A. I told him, I said, 'Mac, do you think he got any
money?' He said, 'Yes,' and I said, *How do you expect to
get it?* He said, *There will be no kick,* you will have nothing
to do, Blue [Blue is the name by which Harper referred to

Bolden],' and we walked across into the doorway of the hotel. . . .

"Q. Did you have any conversation there? A. Yes, *he told me when I asked him over again, I said, 'What is going to be the outcome?' and he said, 'There will be no kick, you will have nothing to do,' and I said, 'I will do it.' "* (Italics added.)

In reference to the witness McGee, Bolden testified as follows: "Q. Did you ask him to help you out in this deal? A. Yes, I asked him . . . and he said, 'What is it, Blue?' just like that, and I said, 'I am not talking' . . . I said, 'No, I am not talking here.' " Upon returning to Salinas after the robbery and assault Bolden again displayed his concern about avoiding detection for the crime. He testified that he asked Harper, "What will you do about the prints?" and that Harper replied, "I am going to rub the car down." It would seem that there was little occasion for Bolden to be concerned about detection through fingerprints unless he believed that Bennett was dead and hence unable to "kick" or "squawk," as he phrased it.

Since the jury were warranted in finding that the killing of Bennett was an element of the conspiracy it would not absolve Bolden from guilt of the murder even if we should assume, contrary to what the jury had a right to find, that Harper went back alone and, faithful to the common design, delivered the fatal blows in the absence of Bolden. ▇ It is well settled that after a conspiracy to commit an unlawful act is established, every act of each member of the conspiracy in pursuance of their original plan is in contemplation of law the act of all of them. (15 C.J.S. 1105, § 74; *People* v. *Stoddard* (1941), 48 Cal.App.2d 86, 89 [119 P.2d 160].)

▇ It cannot seriously be disputed that the minimum design of the conspirators in this case was to rob Bennett and avoid detection. To avoid detection Harper wore gloves at all times concerned and promised Bolden that he would "rub down the car" to remove the latter's fingerprints. But the most important item of all in avoiding detection was the killing of Bennett. Both defendants were known to him. It seems but trite to have to point out that if Bennett were not killed he would, in all probability, be able to identify the defendants and testify against them. Why should Harper have worn gloves and why should Bolden have asked Harper for an extra pair (which he did not get) if they did not contem-

plate killing Bennett to avoid the certain hazard of his complaint and testimony? Obviously this question was one of fact which the jury must be presumed to have resolved against Bolden and their finding is conclusive upon us.

It is also to be observed that in order to convict Bolden legally of the crime of murder the jury did not have to find that the killing was actually agreed upon by the conspirators either expressly or impliedly. The fact is indisputable, upon the record here, that the killing was in furtherance of the common design, even if we limit the common design to robbery and avoidance of detection. To avoid detection much more necessary and important than wearing gloves or removing fingerprints from the car was the killing of the victim. The rule is stated in *People* v. *Creeks* (1915), 170 Cal. 368, 374 [149 P. 821], that "if several parties conspire or combine together to commit any unlawful act, each is criminally responsible for the acts of his associates or confederates committed in furtherance of any prosecution of the common design for which they combine." And in *People* v. *Kauffman* (1907), *supra,* 152 Cal. 331, 334-335, it is declared that (quoting from 8 Cyc. 641) " 'In contemplation of law the act of one [conspirator] is the act of all. Each is responsible for everything done by his confederates, which follows incidentally in the execution of the common design as one of its probable and natural consequences, even though it was not intended as a part of the original design or common plan. . . .' . . . But whether or not the act committed was the ordinary and probable effect of the common design or whether it was a fresh and independent product of the mind of one of the conspirators, outside of, or foreign to, the common design, is a question of fact for the jury [citation], and if there be any evidence to support the finding of the jury on this question, its determination is conclusive." Certainly it cannot be argued in good faith by anyone familiar with criminal law that the killing of his victim by an armed robber at the time of or shortly following the robbery, is inherently an unreasonable result not naturally flowing from and not connected with the robbery. Nor can it be contended with reason that the killing of the victim by a robber unmasked and known to such victim would not further the design to rob and escape detection. And as to conspirators it has been said that "Of course, if in the consummation of an express and unlawful purpose of the

conspiracy, one of the conspirators goes outside of such express purpose and kills, the other conspirators cannot escape responsibility where, as here, such killing is not an unreasonable result to be expected from the acts of sabotage and violence which were contemplated." (*People* v. *Cowan* (1940), 38 Cal.App.2d 231, 239 [101 P.2d 125, 135]; see, also, *People* v. *Sutton* (1936), 17 Cal.App. 2d 561, 568 [62 P.2d 397].)

This court has held repeatedly that "it is not necessary in order to establish . . . [the conspiracy] to prove that the parties met and actually agreed to jointly undertake such criminal action. From the secrecy with which unlawful undertakings are adopted it would be generally impossible to make such proof by direct testimony. Evidence is indirect as well as direct, . . . and it is code law that upon the trial of a case evidence may be given of any facts from which the facts in issue are presumed or are logically inferable; and the jury by the exercise of their judgment or reason, warranted by a consideration of the usual propensities or passions of men, may make such deductions or draw such inferences from the facts proven as will establish the ultimate fact or facts in issue." (*People* v. *Donnolly* (1904), 143 Cal. 394, 398[77 P. 177]; *People* v. *Lawrence* (1904), 143 Cal. 148, 153 [76 P. 893, 68 L.R.A. 193]; *People* v. *Moran* (1904), 144 Cal. 48, 54-55 [77 P. 777]; *People* v. *Eldridge* (1905), 147 Cal. 782, 784 [82 P. 442].)

In *People* v. *Holmes* (1897), 118 Cal. 444, 450 [50 P. 675], the express agreement proved was to "meet at Sixth and Market to-morrow morning at 8 o'clock, and appoint a committee to interview all nonunion men." Defendants the next day went to interview deceased, who thereafter died as the result of a beating inflicted on him by some of the defendants immediately following the interview. Defendants contended (p. 456) "that there was no agreement to commit any battery upon the deceased, or do him any violence; that defendants were doing no unlawful act in asking deceased to quit work the next day when they went in large numbers to the building where he was working; that the conduct of some of the defendants at that time cannot be said to be the ordinary and probable effect of the original intention of all the defendants," and that therefore those defendants who were not shown to have struck deceased were not guilty of homicide. In affirming a judgment of conviction of manslaughter, this court stated (p. 457): "How far the subsequent conduct of defen-

dants went to establish a conspiracy and to what extent they were involved in it . . .; whether the crime alleged was committed in pursuance of the conspiracy found to have been formed, or was the act of some of the persons present done 'as a fresh and independent product of the mind of some of them, and outside of and foreign to the common design,' were questions exclusively for the jury.''

In *People* v. *Kauffman* (1907), *supra*, 152 Cal. 331, the evidence tended to show an agreement among the six defendants to rob a safe at a cemetery in San Mateo County. Defendants went from San Francisco to San Mateo County but when they found that the cemetery grounds were guarded they abandoned their plan, divided into two parties of three each, and returned to San Francisco. After they had reached San Francisco and while the group with which appellant was walking was in advance of the other three defendants, a shooting affray was commenced by the rear group with one Robinson, a policeman, and carried over into the group of which appellant was a member. Robinson was shot to death. Appellant took no part in the shooting. He contended (p. 335) that the ''conspiracy embraced only the proposed burglary at the cemetery, and that when this project was abandoned . . . the conspiracy or common design was at an end, and that anything done thereafter was the individual act of the party doing it.'' In affirming a judgment of conviction of murder this court stated (p. 335) : ''If, as matter of law, it can be said that the criminal combination embraced no more than this contemplated burglary, and that the shooting of Robinson was not within the reasonable and probable consequences of the common unlawful design, it would follow that no case was made out against the appellant. But whether or not the act committed was the ordinary and probable effect of the common design or whether it was a fresh and independent product of the mind of one of the conspirators, outside of, or foreign to, the common design, is a question of fact for the jury.''

In the present case the jury were properly instructed in accord with the law of the above cited cases. (See, also, *People* v. *Bringhurst* (1923), 192 Cal. 748, 751 [221 P. 897].) They were warranted in finding that Bolden did not sever his connection with the criminal enterprise when he got out of the car in Salinas with his share of the proceeds of the robbery

upon the first return from the scene of the crime, if they believed that he did then leave Harper. Upon the record it seems to be indisputable that they were justified in finding that the two crimes were not separate and distinct but that the killing of Bennett was a natural and probable consequence, if not an integral part, of the common design to rob him and escape detection.

Bolden does not suggest that he made any belated express effort to disassociate himself from the unlawful enterprise at the time he parted from Harper. From Bolden's testimony the jury could infer that at that time he was primarily interested in escaping detection. He was in possession of part of the ill-gotten gains of the crime. He apparently thought that the victim was already dead. He knew that Harper intended "to go back to see about the body." Although he had "wiped off . . . places that he might have touched," he expressed concern about possible fingerprints on the car and at his request Harper stated that he was "going to rub the car down." Bolden then said he "was going to leave town. He [Harper] said that would be a good idea to leave town." From the testimony of both defendants, as previously noted, it appears that from the inception of the plan they, and particularly Bolden, were concerned with avoiding the possibility of what they termed a "squawk" or "kick."

As soon as the defendants reached Salinas, Harper returned to pick up his gasoline can because, he testified, it was "positive identification." This second trip to the scene of the crime was no part of the plan to which defendants testified; of course they did not plan to leave "positive identification" at the scene of the crime. Neither was the first beating of Bennett an essential part of the plan to which they directly testified; they actually accomplished their express purpose of robbery without the use of damaging force. But thereafter Harper struck Bennett with the pinch bar in order, he testified, that they might "leave him out there." It seems plain that this assault was a natural and probable consequence of the express plan to rob and avoid detection. It seems equally plain that the defendants then believed that they had probably killed their victim. It was likewise possible for the jury to infer that the trip to remove Harper's gasoline can from the scene of the robbery was a natural and probable consequence of the plan testified to, which expressly involved the use of that gasoline can. If the trip to remove the can in

order to avoid detection, identification and apprehension was in natural and probable sequence of the plan to commit the robbery, then so also, it may be inferred, was the completion of the assault upon Bennett, by killing him in order to obviate the certain hazard of his identification of the defendants, in natural and probable sequence of the unholy plan. The only apparent motive for killing Bennett was to remove such hazard. In that motive Bolden was as much interested as was Harper. The jury could well infer that the murder of Bennett by Harper (if Harper, rather than Bolden, then wielded the pinch bar) was a natural and probable result of such plan, or its miscarriage; if Bennett persisted in crawling to the road (as he had done after the first assault and after he had been dragged out into a field and left for dead or to die) he would soon be discovered and prompt investigation would give defendants insufficient opportunity to escape. (The record discloses that, in fact, after the first assault and prior to the second the ill-fortuned Bennett was observed by two persons, neither of whom, it is to be regretted, offered him succor or made prompt report to a proper agency.)

Bolden left Salinas about noon on November 21, went by cab to Moss Landing, took another cab to Watsonville, and there, at 2:45 in the afternoon, took a bus to Los Angeles. Harper left Salinas about 8:00 o'clock the evening of November 21, hitch-hiked to Gonzales, and there took a bus to Los Angeles. Although each defendant testified that they had no plan to meet after the robbery, they did meet (only by chance, they claim) at the bus station in Los Angeles, a city of approximately 2,800,000 inhabitants, at about 11:30 o'clock Monday night, November 22, and went together to El Centro or Mexicali. After a few days they again parted.

In this state of the evidence, even if we eliminate from consideration as against Bolden all of Harper's assertedly uncorroborated testimony and assume further in favor of Bolden that the killing of Bennett was not actually contemplated in advance by the conspirators, the jury were, nevertheless, warranted in finding that the murder was a natural and probable consequence of the defendants' plan to rob him and to forestall any "kick" or "squawk" incident to such robbery, and that the conspirator Bolden is, in the eyes of the law, as guilty of the murder as if he had been present at the time the fatal blows were struck.

But it must also be emphasized that the jury had a perfect

right to believe Harper in preference to Bolden. The record discloses material circumstances, a number of which have been previously related, which tend to corroborate Harper in some of the particulars wherein his testimony differed from that of Bolden.  The law requiring corroboration of an accomplice does not exact corroboration in every detail. It requires only that the testimony of the accomplice "be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense." (Pen. Code, § 1111.)  The record here abundantly connects Bolden with the commission of the offense. By his own testimony he was a party to the conspiracy to rob Bennett; in fact, he actively promoted it and, according to strong and convincing evidence, originated the plan to rob someone, asking Harper to help in selecting a victim who had money; he participated in the robbery; he received approximately one-half of the stolen money; he expressed concern repeatedly both before and after the robbery that the project be so carried out that there be no "kick" or "squawk" and no available identification of the perpetrators of the offense; he thought that Bennett had been killed by the first assault. Under these circumstances the jury were legally bound to consider the testimony of Harper that it was Bolden who finally struck the fatal blows and we have no right under the law to disregard the testimony of Harper or to hold that the jury could not believe it.  It is the established law of this state that "While the jury may consider the circumstance that a witness is an accomplice, in passing upon his credibility as a witness [citation], his testimony is not to be rejected merely because he is an accomplice, and if there is other evidence which measures up to the requirement of the code (*supra*), tending to connect the defendant with the commission of the crime charged, then such testimony of the accomplice is to be considered by the jury, as is any other testimony, and must be given the weight to which the jurors may conclude that it is entitled. [Citation.] The evidence tending to connect a defendant with the commission of the crime may be slight and, when standing by itself, entitled to but little consideration. [Citation.] The law does not require that the evidence necessary to corroborate the testimony of an accomplice shall tend to establish the precise facts testified to by the accomplice; and strong corroborative testimony is not necessary to support a judgment of conviction founded on the testimony of an accom-

plice. Even though circumstantial and slight, the evidence is, nevertheless, sufficient if it tends to connect the accused with the commission of the offense. [Citations.] The defendant's own statements and admissions, made in connection with other testimony, may afford corroboratory proof sufficient to sustain a verdict. [Citations.] It is not necessary that the corroborating evidence should go so far as to establish by itself, and without the aid of the testimony of an accomplice, that the defendant committed the offense charged." (*People* v. *Negra* (1929), 208 Cal. 64, 69-70 [280 P. 354].)

█ It is not overlooked that each defendant testified that he was solicited by the other to participate in the proposed crime. As appears from the majority and dissenting opinions in *People* v. *Clapp* (1944), 24 Cal.2d 835 [151 P.2d 237], and *People* v. *Wilson* (1944), *ante*, p. 341 [153 P.2d 720], we were not in accord on the question as to whether section 653f of the Penal Code (solicitation to commit robbery, murder, etc.) is, in respect to robbery and murder, the substantial counterpart of section 275 (solicitation for, or submission to, abortion) in respect to abortion, but we are in accord that the solicitor of a crime of murder or robbery is, when the solicited offense is actually committed, for such solicitation punishable under section 31 of the Penal Code as a principal in the crime of murder or robbery.

For the reasons hereinabove stated the judgments against each defendant and the order denying defendant Bolden's motion for a new trial are affirmed.

Gibson, C. J., Shenk, J., and Traynor, J., concurred.

CARTER, J.—I concur in the conclusion reached, but as I read the main opinion it purports to place the onus of the crimes on Bolden. In this respect I do not believe it fairly depicts the true factual situation as disclosed by the record. It is true that the two defendants undoubtedly entered into an agreement to "roll" Bennett and rob him of his money. Harper says the plan to "roll" "someone and get a piece of money" was first suggested by Bolden. On the other hand, Bolden testified that he knew nothing about any plan to rob anyone until the morning of the crime, and that he was then told by Harper that he (Harper) had their victim ready and asked Bolden to go along; that the latter would

have nothing to do and that there would be no "kick." Whether Harper or Bolden was the originator of the plan, it is evident from the admitted facts in this case that Harper, unknown to Bolden, made all arrangements for the robbery and had the victim ready for the fatal trip before he informed Bolden of his plan.

Harper was a man thirty-one years of age and an ex-convict, having previously been convicted of a felony. Bolden was but twenty-six years of age and had never been in trouble before. Bolden had never seen Bennett, their victim, before the morning of the day when the crime was committed. Harper was not only well acquainted with Bennett but they worked together as truck drivers on the Church ranch. Harper persuaded Bennett to take the latter's car. and make the trip to the Cole ranch. Harper conceived the ruse of the stalled car and the need of its owner for some gasoline. Harper procured the can of gasoline and put it in Bennett's car. He also secured the iron pinch bar and placed it in the rear of Bennett's car. He concocted the scheme of offering to sell Bennett a watch in order to ascertain whether Bennett had any money. With this plan all worked out, with the deadly equipment safely secreted in the rear of the car, and sitting alongside of his innocent victim, Harper directed Bennett to drive to Bolden's place of business. Whether they went there by reason of a previous plan agreed to by Bolden, as Harper says, or to inveigle Bolden to go with them and help carry out the plan, as Bolden says, is one of the disputed facts in this case. It is the word of a hardened criminal, an ex-convict, against the word of a young man who had never been in trouble before. This background of the two persons who are charged with the murder of Bennett will help to explain some further facts to be later discussed. Whether Bolden seduced the ex-convict Harper into the commission of the crime with which they are charged, or whether Bolden was beguiled by Harper, an older man and hardened criminal, to go along, Bolden did become a party to the plan to rob and murder Bennett and he is responsible for every act that was committed by either of them in furtherance of that plan. After the two returned from the first trip, Bolden says he left Harper at Salinas, took a taxicab to Moss Landing and there changed to a second taxicab for Watsonville, where he caught a bus to Los Angeles. Afterwards, Harper returned to the scene of the crime and found Bennett alive. Harper again assaulted Bennett, beat him over the head with the iron

pinch bar and killed him. There is not one word of evidence or a single circumstance in this whole case which tends to show that Bolden was with Harper on this second trip, except the uncorroborated word of Harper, an accomplice and a witness impeached by the fact that he had previously suffered conviction of a felony.

In my opinion the evidence was sufficient to justify the jury in drawing an inference that Harper and Bolden entered into a conspiracy to rob Bennett and then murder him, or vice versa, so that he would not be available to furnish information and evidence which would lead to their arrest and conviction. It is clear that the evidence of a prearranged conspiracy to murder Bennett is wholly circumstantial, but there were sufficient facts adduced by competent evidence from which the jury might conclude that such prearranged conspiracy existed. The fact that Bolden assured the witness McGee that there would be no "kick" or "squawk"; that the lethal weapon used was an iron pinch bar; that Bennett was directed to transport Harper and Bolden to a somewhat secluded place before he was assaulted and robbed; and that Bolden talked about Harper going back "to see about the body," are facts from which a reasonable inference may be drawn that it was the intention of both Harper and Bolden to kill Bennett as well as rob him. Such being the case, it is immaterial what Bolden's conduct was after he and Harper separated in Salinas after they had robbed Bennett and left him presumably dead. In my opinion the testimony of Harper that Bolden returned to the scene of the crime with him and struck the blows which resulted in Bennett's death is wholly insufficient to establish the fact that Bolden did the things testified to by Harper for the reason that Harper was an accomplice and his testimony was uncorroborated. (See Pen. Code, § 1111.) However, I am of the opinion that the jury were justified in drawing the inference that if Harper returned to the place where Bennett was first assaulted and administered the blows which resulted in his death, after Bolden had left for Los Angeles, the consummation of the murder was within the contemplation of the conspirators and Bolden was equally guilty with Harper of the murder of Bennett. (15 C.J.S., § 74, p. 1105.)

I must confess that the competent evidence connecting Bolden with the crime is not very strong, but in my opinion it was for the jury to say whether or not it was sufficient to

satisfy their minds to a moral certainty and beyond a reasonable doubt that Bolden did conspire with Harper to murder Bennett as well as rob him, and, as above stated, there is evidentiary basis for an inference that such was the plan. It is not our province to weigh the evidence, but only to determine whether there is any substantial evidence, direct or circumstantial, to support the verdict. If there is such evidence, the weight to be given to it is solely a matter for the determination of the jury.

As I understand the next to the last paragraph of the main opinion, it purports to say that a different rule should be laid down with respect to abortion cases than in cases of murder and robbery where the element of solicitation is involved. I do not agree with such purported distinction, and, in my opinion, the cases of *People* v. *Clapp*, 24 Cal.2d 835 [151 P.2d 237], and *People* v. *Wilson*, *ante*, p. 341 [153 P.2d 720], should be overruled and thus eliminate the confusion which they have added to the law of this state.