Filed 5/8/14  P. v. Reyes CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B248663 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA037295) |
| v. | |
| CESAR OCTAVIO REYES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa M. Chung, Judge.  Affirmed.

Charlotte E. Costan, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Connie H. Kan, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant, Cesar Reyes, was convicted, following a jury trial, of the kidnapping and second degree murder of Nick Ramirez in violation of Penal Code[1] sections 207 and 187. The jury found true the allegation that a principal was armed in the commission of the offenses within the meaning of section 12022, subdivision (a)(1). The jury also found true the allegation that appellant was suffered a prior serious felony conviction within the meaning of section 667, subdivision (a)(1) and sections 667, subdivisions (b)through (i) and 1170.12 (the "three strikes" law). The trial court sentenced appellant to 15 years to life in state prison for the murder conviction, doubled to 30 years to life pursuant to the three strikes law, plus a one-year term pursuant to section 12022 and a five-year term pursuant to section 667, subdivision (a). The trial court sentenced appellant to a total term of 22 years in state prison for the kidnapping conviction, stayed pursuant to section 654.

Appellant appeals from the judgment of conviction, contending the trial court erred in (1) admitting evidence that he possessed a razor blade in violation of jail regulations and instructing the jury on attempts to suppress evidence; (2) ordering him to wear two sets of restraints and failing to instruct the jury to disregard the restraints; (3) admitting evidence of his criminal history; (4) refusing to dismiss a juror who was a co-worker of the victim's brother; (5) failing to instruct the jury that co-perpetrator Bernardino was an accomplice as a matter of law; and (6) denying his motion to dismiss his prior strike conviction. Appellant also contends there is insufficient evidence to support his murder conviction. He further contends the abstract of judgment does not reflect the custody credit awarded by the trial court at sentencing. We affirm the judgment of conviction.

Facts

On September 18, 2006, the body of Nicholas Ramirez ("Nick") was found in the trunk of his Honda, which was parked in the bushes about 80 feet from Avenue Q in

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

Littlerock.  Nick was lying on his right side with his wrists tied behind his back.  A cloth and some tape was tied around his mouth.  Los Angeles County Sheriff's Deputy Leo Lane observed nine bullet holes in the trunk of the Honda.  An autopsy later showed that Nick had died on September 16, 2006.

When the investigating officer, Detective Eddie Brown, notified Nick's family of his death, the detective learned that Nick had been at a party on the night of September 15 and was not seen by his family after the morning of September 16.  The party was held to celebrate the 21st birthday of Jesse Ramirez ("Jesse"), Nick's brother.  It took place in the garage of Jesse's friend Jaime Garcia.  Also present at party were Javier Esparza, Martin Guzman, Claudio Bernardino, Nick's friend, Tasha Wilmes.

Jesse stated that he got into a fight with Esparza at the party.  Garcia pulled Jesse away and calmed him down, but the atmosphere remained "tense."  Nick and Wilmes left the party to give Bernardino a ride home, but Nick returned to the party, finally leaving for good at about 4:00 a.m.  Wilmes did not observe Nick having any "problems" with Garcia, Esparza, Bernardino, or "Sniper" during the party.

Jesse and Guzman left the house at about 6:00 a.m.  Guzman had been staying with Garcia and Esparza, but Guzman "had Jesse's back" at the party.  Jesse did not think it was safe for Guzman to stay at Garcia's house, so Guzman decided to stay with a friend in Los Angeles.  Guzman slashed the tires of Garcia's car so that Garcia and Esparza could not follow them.  Jesse and Guzman took a train to Los Angeles.

A few weeks after the murder, Detective Brown discovered that the gun used in Nick's murder had been stolen by Garcia in a 2005 burglary.[2]

---

[2]  Specifically, the detective received information that the gun used in the murder had been stolen in a burglary in Littlerock in 2005.  Detective Brown investigated and discovered that James Wilson had reported that a .40 caliber Smith & Wesson pistol had been stolen from his residence in 2005, along with some other firearms and a laptop.  The burglary occurred shortly after Wilson had shown the guns to Guzman.  Wilson still had a bag of shell casings which had been fired from the .40 caliber pistol.  It was later determined that Wilson's casings and casings found at the scene of Nick's murder were fired from the same gun.  Samples of a blood stain left in Wilson's house during the

DNA samples were obtained from various areas of Nick's Honda. The DNA in samples from the interior and exterior handle of the passenger's side door was consistent with a reference sample of Esparza's DNA.

DNA samples were also obtained from the cloth gagging Nick. The DNA profile was entered into the CODIS database and was matched with appellant, who was not at the party.

The Sheriff's Department obtained search warrants for a number of locations, including the home of Garcia's girlfriend, Laura Acosta. Detective Brown found nothing related to the case at Acosta's house, but Acosta gave the detective the name of Matthew Foust.

Detective Brown contacted Foust. Foust eventually told Detective Brown about Nick's murder, after receiving assurances that his sister would be kept safe. Foust implicated Garcia and Esparza, and told the detective that a short stocky guy was also involved in the crimes. He identified appellant from a photographic line-up as that guy. Foust took Detective Brown to a residence where Nick had been beaten before being put in the trunk of the car. Bernardino was living in that residence in September 2006.

Detective Brown obtained a search warrant for the residence. Swabs were taken from bloodstains on the living room carpet and the garage floor. The DNA from the bloodstains was consistent with Nick's DNA. He was the major contributor of the blood on the garage floor.

Garcia, Esparza and Bernardino were arrested in early 2007, tried and convicted of the kidnapping and murder of Nick. Foust testified for the prosecution at that trial. Appellant was extradited from Mexico in 2011 and tried separately in this case. Bernardino, who did not testify at his own trial, testified for the prosecution in this trial. Foust again testified for the prosecution in this trial.

Foust gave the following account of events. He drove from Arizona in his burgundy Buick to Garcia's house to buy tires, rims and a car stereo from his friend

burglary were analyzed by the Sheriff's Department. The DNA profile of the blood matched Garcia.

4

Garcia.  He arrived at about 2:00 a.m. or 2:30 a.m.  A party was going on.  Foust and Garcia ate and went to sleep on the living room floor.  They woke up about 7:00 a.m. and Foust drove Garcia to Laura Acosta's house, got the tires and rims and returned to Garcia's house.

Once Garcia got back to his house, he realized that his tires had been slashed and his stereo stolen.  He became very angry.  Foust recalled that Garcia had said something about Esparza beating up some guys at the house.  Garcia and Esparza both said that it could have been "those guys from last night."

Garcia went into the house and came back out with a gun.  He told Foust to drive Garcia and Esparza to "find those guys" from last night.  Foust complied.  He was "pretty scared" because Garcia was holding a gun and he did not know what Garcia was capable of doing at that time.  Foust stopped to pick up appellant, who was waiting outside his house.  Then Foust drove to the Ramirez house.

At the same time that Foust and the others reached the Ramirez house, Nick's sister Yvonne Ramirez ("Yvonne") saw Nick drive out onto the street in his red Honda and come to a stop because another red car was coming from the opposite direction.  This was the car driven by Foust.  Both cars stopped and Nick stared at the other car for one minute and then just kept driving.  The other car drove in the opposite direction.  Yvonne recalled seeing two people in the front of that other car, but did not see that car follow Nick's car.

Foust did follow Nick, who went to a gas station.  Foust pulled up right behind him.  Garcia and appellant approached Nick as he was heading into the gas station.  Garcia and appellant pulled Nick back into his car and talked to him from the driver's side window as Nick sat in the driver's seat.  Garcia got into the passenger seat of Nick's car.  Appellant got back into Foust's car and told Foust to follow Nick's car.

Nick eventually pulled into the driveway of Bernardino's house.  Foust parked in the front of the house.  Garcia and Nick walked to the front door, and Garcia asked Bernardino if they could come into the house "real quick."  Garcia said he wanted to talk to Nick about something in Bernardino's presence, so Bernardino let them in. Bernardino

5

gave Garcia and Nick a chance to talk.  He recalled Garcia saying something to Nick about a stolen stereo.

After they finished talking, Garcia walked out of the house and motioned for Esparza, Foust, and appellant to come inside.  Everyone but Foust walked to the front door.  Foust stayed in the car because he did not want to go inside the house. Garcia came back out and told Foust to "get in the house."  Foust was scared because the tone of Garcia's voice was "kind of threatening."  Foust did not see the gun at that point.

Foust and Bernardino's accounts of events inside the house differed somewhat.  Both agreed that once inside the house, Garcia asked Nick where his stereo was, and also where Jesse was.  Appellant then punched Nick in the face without warning.  Nick fell down in the hallway area and started bleeding from his mouth onto the carpet.  Bernardino said, "Take him into the garage.  You are getting blood everywhere."  Bernardino wiped up all the blood in the living room.

Garcia took Nick into the garage.  According to Bernardino, appellant said, "Tell us where the stereo is at.  Tell us where your brother is at."  Nick replied that he did not know.  They made him sit down.  Appellant and Garcia started getting upset because Nick was not giving them answers.  At some point, both Bernardino and Foust saw appellant take a metal pipe and hit Nick in the head with it.  The pipe was about 18 inches long, and had a diameter of one and one-half inches.  It was a "pretty hard blow," and some of Nick's blood spattered on them and the wall.  According to Foust, Garcia kept asking where his stuff was, and where Jesse was.  Nick replied, "I'm not going to tell you."  He did not struggle or fight back.  He bled from his face onto his clothes.

At some point, Garcia said he was going to "blast" Nick and asked Esparza to get his gun, which Esparza did.  Foust observed that the gun was a black and silver semi-automatic pistol which appeared to be .40 or .45-caliber.  According to Foust, Bernardino said, "Take him out to the desert" and "blast him."  Esparza kicked Nick and Garcia hit him.  Esparza had the gun on his lap, and at some point, Garcia came over, picked it up, and pointed it at Nick. Garcia said, "Tell me where my system's at.  Tell me where your brother is at.  I know you know.  I am going to blast you, smoke you."  Nick did not

6

respond. Bernardino did not think that Nick was "fully aware" of what was going on because he had just gotten hit very hard with a pipe. He was bleeding onto the floor so someone handed him a rag.

Appellant hit Nick a few more times in the back with the metal pipe. According to Foust, appellant beat Nick more than any of the others did. Appellant hit Nick with the pipe as though he were swinging a baseball bat. Appellant hit Nick hard in the face once or twice with the pipe. At some point, Bernardino heard appellant tell Garcia that "they w[ould] have to go through with it because he didn't want Nick telling the police about what happened in the garage." Appellant also said, "We got to smoke him." According to Foust, appellant told Nick that "he was going to blast him if he didn't give up the information regarding the stereo equipment." Nick said, "Kill me, but leave my family alone."

Garcia took Nick's car keys, threw them to Bernardino, and told him to drive the Honda into the garage. Either Garcia or appellant found Nick's backpack inside the car and searched it. Appellant found a scale and kept it for himself. Bernardino then saw both appellant and Garcia ask Nick to get into the trunk. As Nick walked towards the car, appellant hit him on the back again with the pipe. Nick fell to his knees so Bernardino grabbed him by his arm and walked him to the car. Appellant cut the elastic ropes on Nick's backpack with a kitchen knife from Nick's pockets, and appellant and Garcia both tied Nick's hands behind his back with the elastic rope. They also used tape. According to Bernardino, appellant removed his tank top and wrapped it around Nick's head and mouth. He tied a knot and put his foot on the knot to tie it even tighter. Appellant said it was not the first time he had done that. Garcia wrapped tape around the gag after appellant had tied it. Foust testified that appellant had given his shirt to Garcia, and Garcia was the one who wrapped it around Nick's head and mouth. Garcia and appellant then told Nick to step into the trunk. Garcia was wearing gloves as he pushed Nick into the trunk.

7

Bernardino then opened his garage door and let everyone out.  Garcia told Bernardino to "clean this shit up and don't fuck up," referring to Nick's spilled blood.  Bernardino believed that Garcia took a pair of black work gloves from the garage.

Garcia drove Nick's car and Foust followed behind with appellant and Esparza.  At some point, appellant told Foust, "Stop, let me out."  Foust stopped and appellant got out and "kind of ran" down the street.  When appellant told Foust to stop the car, Esparza did not say anything in response.  Foust continued to follow Garcia.

Garcia eventually parked the car in a desert area near a "bunch of shrubs and bushes."  Esparza told Foust to stop the car as well.  Esparza got out of Foust's car and walked up to the Honda.  Shortly after, Foust heard gunshots.  He looked back and saw Garcia over the trunk of the Honda.  After hearing a "couple more" gunshots, Foust saw Garcia and Esparza run towards his car.  They got in and said, "Go, go, go, go, go."  As they were driving away, Garcia said, "Go back, I left the shells," but Esparza said, "No, no."  Foust was scared.

Garcia told Foust to drive to appellant's house.  There, Esparza and Garcia changed their clothes.  When they got back into Foust's car after changing their clothes, neither Garcia nor Esparza said anything about appellant.  Garcia told Foust, "You are going to take me and my brother . . . back to Phoenix with you."  Foust drove Garcia and Esparza back to Arizona and the two of them stayed at his house for one or two days.  Garcia then took a bus back to California and Esparza took a bus to El Paso.

Appellant testified in his defense at trial.  On September 16, 2006, appellant lived on Avenue S6 in Littlerock, his home since 2001.  He did not attend the Ramirez birthday party, but he did party with friends at his own house.  Garcia woke him up around 8:30 a.m., claiming an emergency.  Appellant got into a red Buick and its occupants explained to appellant that they wanted to retrieve property from Nicholas Ramirez who lived on Avenue S4.  Appellant did not know that Garcia had a gun until they got to the gas station.

At the gas station, Garcia got into Nick's Honda, leaving appellant, Esparza, and Foust in the Buick.  Foust followed the Honda to Bernardino's house in the Qs.  By the

8

time Foust arrived, Garcia and Ramirez were already at the open front door. Foust, Esparza and appellant followed the others.

Inside, a lot of arguing ensued. Nick denied having anything to do with the stolen property or knowing where his brother was. Appellant socked Ramirez in the mouth. Bernardino was angry about blood dripping on the floor. As appellant cleaned the blood on the linoleum with his T-shirt, Bernardino told the others, "Take it to the garage."

The others went to the garage. Appellant followed after he finished cleaning up the blood. Nick was sitting on a chair. Garcia, Esparza, and Bernardino were punching Nick. Appellant did not strike Nick with a rod, and no one else did either. While in the garage, appellant never hit Nick with a fist or anything else.

Bernardino grabbed appellant's T-shirt and threw it to Garcia, who in turn gave it to Nick. Nick used the t-shirt to dab the blood on his face. Garcia then tied the shirt around Nick's face, saying, "I'm going to smoke you if you don't give me my things." Appellant did not make such a comment and did not threaten to blast Nick.

Garcia and Nick left the garage. The others remained behind. Appellant did not see Nick ordered into the trunk. Appellant believed that the others just intended to scare Nick so that he would give back their belongings. He had no idea Garcia intended to kill Nick. Appellant saw the situation escalating, but he was afraid to intervene because Garcia had the gun.

Garcia drove off in the Honda. The others followed in Foust's Buick. Appellant was concerned because he could not see a passenger in the Honda. Not wanting any part of this, appellant asked Foust to stop the car and let him out. Foust did, and appellant took off running down 100th Street. Two blocks later, appellant heard gunshots. He went home.

The others did not come to his house to change clothes. Appellant did not call police because he feared for the safety of his many family members who lived in the area. When cross-examined by the prosecution, appellant admitted to a felony conviction for assault. Appellant had been thinking of going to Mexico since back in April. On January 17, 2007, appellant left for Mexico.

9

At the time of his arrest, appellant he told detectives that at the time of the assault he had been "tweaking" on methamphetamine and had not slept in three days. He told detectives the assault was just supposed to be an "ass beating." It was not his beef even though he was the first to use force against Nick. Appellant told the detectives that he saw Garcia and Esparza going at Nick, "Boom, boom, boom." He also told the detectives that he saw Garcia and Nick walk to the trunk, Garcia pop open the trunk, Nick get in the trunk, and Garcia close it. Appellant figured that is what must have happened because Garcia was with Nick. Appellant did not actually see Nick get into the trunk.

Discussion

1. Razor evidence

While in the courthouse lock-up, appellant was found in possession of a razor shaver head ("razor") concealed between two pieces of bread. Appellant contends the trial court erred in overruling his relevance and Evidence Code section 352 objections to the introduction of this evidence. He further contends the introduction of this evidence deprived him of his federal constitutional rights to a fair trial and due process. Appellant further contends his counsel was ineffective for failing to object to the razor evidence under Evidence Code section 1101. Appellant additionally contends the prosecutor committed misconduct in discussing the incident. We see no abuse of discretion, no ineffective assistance, no prosecutorial misconduct and no violation of appellant's federal constitutional rights.

a. Evidence Code section 352

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

A trial court has broad discretion to weigh the probative value of evidence against its potential prejudicial impact. A court's decision that the probative value of the

10

evidence outweighs its prejudicial impact will not be disturbed on appeal unless the court exercised its discretion in "'an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citations.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) A trial court "need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352." (*People v. Taylor* (2001) 26 Cal.4th 1155, 1169.)

Here, on October 30, the prosecutor informed the court that Bernardino had encountered appellant while being transported to or from the courthouse, and appellant had said to him, "Do what you are going to have to do," or "Do whatever it is you are going to do."[3] That same day, the court and the parties discussed whether Bernardino would be permitted to testify that appellant was an enforcer. The court stated: "Well, if [Bernardino] testifies, I am sure we'll have a talk with him prior to that. [¶] Is he being ordered out tomorrow or --" The prosecutor replied: "He is being ordered out tomorrow. I still have not made a final decision. I think I am going to order him out every day until I make a decision or we're done with our testimony."

On October 31, the razor was found in appellant's sandwich. It was initially described as a "loose razor blade" but it was later clarified that in fact it was a plastic shaver head with a razor blade imbedded in it. The shaver head itself could not be used as a weapon, but if the blade were removed from the plastic encasing, the blade could be used as a weapon.

Appellant denied any intent to use the razor as a weapon. He explained that he wanted the razor to shave, because he had been unable to shave or shower for two days in jail. The court described appellant's appearance that day as follows: "I am looking at him. It is not like he has a full beard. I can barely see any facial hair other than the

---

[3]     Bernardino described this encounter to Detective Brown, who was in court and confirmed the prosecutor's account.

mustache that appears visible. It doesn't appear to be unkempt or unruly, or growth or any appearance of overgrowth such that they would be prejudiced against him."[4]

The court initially ruled evidence of the razor blade incident would be excluded under Evidence Code section 352 unless "anything additional comes out independently through Mr. Bernardino." Bernardino did testify that he was concerned about testifying because inmates who testify run the risk being assaulted or even killed. He explained that there were "different degrees of being a snitch," with identifying someone being the least risky and actually testifying against someone in court being the riskiest. Outside the presence of the jury, the prosecutor represented to the court that Bernardino had learned of the razor incident on his own.[5]

After Bernardino testified, the court ruled that if appellant testified, appellant could be questioned about the razor incident. The court indicated that it would then instruct the jury with CALCRIM No. 371 concerning attempts to suppress evidence.

The above facts support a reasonable inference that appellant acquired the razor to use as a weapon against Bernardino to deter him from testifying. Appellant acquired the razor in the morning of the first day that Bernardino was scheduled to be brought to court. Appellant's appearance was not unkempt and a jury could reasonably believe that appellant would not have taken the risk of obtaining a contraband razor simply to remove some barely noticeable face hair. Since, an attempt to suppress evidence can show consciousness of guilt, the razor evidence was relevant. We see no abuse of discretion in

---

[4] Appellant points out that a defendant has a constitutional right to appear before the jury in civilian clothing, citing *People v. Taylor* (1982) 31 Cal.3d 488, 499 and *United States v. Casey* (5th Cir. 1976) 540 F.2d 811, 816.) He argues that by parity of reasoning, a defendant has the right to appear before a jury showered and shaved. Assuming appellant had such a right, we would see no violation of that right here. As the above remark shows, the court expressly found that appellant's appearance was not unkempt and would not prejudice the jury. (See *People v. Kozel* (1982) 133 Cal.App.3d 507, 537.)

[5] Earlier, the parties had learned that Bernardino's attorney had not conveyed the razor blade incident to Bernardino. The prosecutor and Detective Brown were concerned for Bernardino's safety, and Detective Brown told Bernardino. Bernardino stated that he had already heard about the incident.

the trial court's implied ruling that the probative value outweighed the potential prejudicial impact.

b. Evidence Code section 1101

Appellant argues that the jury could not help but see the razor evidence as bad character evidence, and so his counsel was ineffective in failing to object to the evidence on Evidence Code section 1101, subdivision (a) grounds.

Appellant has the burden of proving ineffective assistance of counsel. (*People v. Pope* (1979) 23 Cal.3d 412, 425.) In order to establish such a claim, appellant must show that his counsel's performance fell below an objective standard of reasonableness, and that, but for counsel's error, a different result would have been reasonably probable. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694.) "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citations.]" (*People v. Thomas* (1992) 2 Cal.4th 489, 530-531.)

Evidence Code section 1101, subdivision (a) provides that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Such evidence is admissible to prove facts other than a person's disposition, and to support or attack the credibility of a witness. (Evid. Code § 1101, subds. (b) & (c).)

Appellant's trial counsel objected strenuously and repeatedly to the introduction of the razor evidence on the grounds that it was speculative and not relevant. Counsel could reasonably have believed that these were the strongest grounds for exclusion and made a tactical decision to focus on those grounds and not raise more marginal ones such as

Evidence Code section 1101. We accord great deference to trial counsel's tactical decisions. (*People v. Thomas, supra*, 2 Cal.4th at pp. 530-531.) Appellant has not shown ineffective assistance of counsel.

c. Prosecutorial misconduct

Appellant contends the prosecutor misled the court and the jury by referring to the razor as a "razor blade" rather than a razor shaver head. We do not agree.

A prosecutor commits misconduct when he or she misstates or mischaracterizes the evidence. (*People v. Hill* (1998) 17 Cal.4th 800, 823.)

We see no intent to mislead in the prosecutor's use of the shorthand term "razor blade." There was a razor blade in the razor shaver head. Further, the court itself used the shorthand term, and the court's comments show it was well aware of the exact nature of the object. As the court said in ruling that appellant could be questioned about the incident, "I will note that the way it was found is the razor was still incased in its plastic head." The court was clearly not misled.

In questioning appellant, the prosecutor did use the term "razor blade," and appellant explained that the object was actually a razor head. Questions of counsel are not evidence, and the jury was so instructed. Appellant's description of the object was evidence, and was undisputed. In discussing the incident during closing argument, the prosecutor used the term "razor head." Thus, there is no reasonable probability that the jury was misled by the prosecutor's use of the term razor blade during questioning.

Appellant also contends the prosecutor misled the court and the jury about the timing of appellant's acquisition of the razor. We again do not agree.

When the razor was first discovered, the prosecutor stated that the previous day he "had indicted at that time [he] had not made a final decision about whether Mr. Bernardino would be testifying" and had stated he "would like Mr. Bernardino to be brought out to court every day until I have either made a decision or the case was over." At the end of that discussion, the court stated it would discuss the admissibility of the razor evidence "in more detail if and when Mr. Bernardino testifies."

In questioning appellant, the prosecutor did ask if appellant heard on October 30 that the decision had been made to call Bernardino, but appellant replied in the negative. The prosecutor then refocused his question on appellant's knowledge that Bernardino would be in the courthouse the next day. In discussing the incident during closing argument, the prosecutor stated appellant brought the razor head "into the courthouse on the very next morning when he found out that Claudio Bernardino was coming for sure." This is an accurate time reference. We see no reasonable probability the jury was misled by the prosecutor's questions.

2. Jury instruction on suppression of evidence

Appellant contends the trial court erred in instructing the jury with CALCRIM No. 371 concerning attempts to suppress evidence. He contends there was no evidence to support the instruction and so the instruction violated his federal constitutional rights under the Fifth, Sixth and Fourteenth Amendments.

Claims of instructional error are reviewed de novo. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.) "It is error to give an instruction which . . . has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)

CALCRIM No. 371 stated: "If the defendant tried to hide evidence or discourage someone from testifying against him, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

As we discuss, above, there is sufficient evidence to support a reasonable inference that appellant brought the razor to the courthouse intending to use it to deter Bernardino from testifying. Thus, there is sufficient evidence to support CALCRIM No. 371. There was no violation of appellant's federal constitutional rights.

15

3. Restraints

After the razor was discovered, the trial court ordered appellant to wear a stealth belt and leg shackles. The court stated that the belt would be visible, but the shackles concealed from the jury's view. Appellant contends that since he had leg shackles, the visible waist restraint was unnecessary and prejudicial.

A defendant may be physically restrained at trial only if there is a "manifest need" for such restraints. (*People v. Seaton* (2001) 26 Cal.4th 598, 651.) Manifest need may be shown by nonconforming behavior. (*People v. Cox* (1991) 53 Cal.3d 618, 651.) "'The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed an abuse of discretion.' [Citation.]" (*Ibid.*) "[E]ven when special court security measures are warranted, a court should impose the least restrictive measure that will satisfy the court's legitimate security concerns." (*People v. Mar* (2002) 28 Cal.4th 1201, 1206.)

As we discuss, supra, the facts surrounding appellant's acquisition of a razor supported an inference that he intended to try to dissuade Bernardino from testifying. As the trial court stated, the razor blade "is part of the reason of why [appellant] is sitting here both with a stealth belt and . . . leg shackles." Thus, there was a showing of a threat of violence, and some physical restraints were warranted.

Appellant did not object to the restraints, and so has forfeited his claim that the belt was unnecessary. (See *People v. Majors* (1998) 18 Cal.4th 385, 406.) Appellant contends any objection would have been futile, and counsel need not make futile objections. (See *People v. Hill*, *supra*, 17 Cal.4th at p. 820.) We do not agree that an objection would have been futile. The trial court had the defense table modified so that the leg shackles were not visible to the jury, and so was clearly concerned with minimizing the visibility of the restraints. This does not suggest that a court would have automatically and categorically rejected all objections to the belt.

We note that while leg shackles would have prevented appellant from moving away from the defense table, it would not have prevented from standing up. The stealth belt would have kept appellant from standing up, a move which could seem intimidating

to a witness. Further, the more detailed record which would have resulted from an objection would have been particularly useful in this case. Stealth belts, as the name suggests, are designed to be unobtrusive.[6] The court may have misspoken when it said the stealth belt would be visible. The courtroom may have had a peculiar layout which rendered the normally unobtrusive belt visible to the jury, and which could have been blocked on request.

4. Failure to instruct on restraints

Appellant contends the trial court erred in failing to instruct the jury sua sponte that appellant's restraints had no bearing on a determination of his guilt. We agree, but find the error harmless.

If a defendant's physical restraints are visible to the jury, the court has a sua sponte duty to instruct the jury that such restraints should have no bearing on the determination of the defendant's guilt. (*People v. Lightsey* (2012) 54 Cal.4th 668, 721.)

Here, the trial court stated that the stealth belt would be visible to the jury. The trial court may have misspoken since, as the name suggests, stealth belts are designed to be unobtrusive. Assuming the court was correct about the belt's visibility, the court had a sua sponte duty to instruct the jury on this issue.

The failure of a court to instruct the jury about restraints constitutes reversible error only if it is "'reasonably probable that a result more favorable to [defendant] would have been reached in the absence of such error.'" (*People v. Jacobs* (1989) 210 Cal.App.3d 1135, 1142, quoting *People v. Watson* (1956) 46 Cal.2d 818, 836.)[7]

---

[6]     The court described that stealth belt as a belt that attaches to a hook on the defendant's chair. Appellant sometimes refers to the belt as a stun belt. There is nothing in the record to suggest that appellant was wearing a stun belt.

[7]     Appellant makes a general statement that the claimed instructional errors in this case violated his Fifth, Sixth and Fourteenth Amendment rights under the U.S. Constitution. He then contends generally that any instruction which lowers the prosecution's burden of proof violates the due process clause. We do not agree that the

The evidence supporting appellant's convictions was very strong. Appellant's DNA was found on the cloth gagging Nick, and when appellant testified he did not dispute that he was present from the beginning of the kidnapping through the first part of the drive to the area where Nick was shot. Appellant left shortly before the shooting, but the other three perpetrators came to him for assistance after the shooting, indicating that appellant was still an active participant in the crimes. Appellant fled to Mexico after the murder, indicating consciousness of guilt.

It is far from clear that the jury even understood what the stealth belt was. Generally, stealth belts resemble normal belts worn with clothing, but can be attached to a chair. The belt leaves a defendant's hands free, and thus, unlike handcuffs, do not strongly suggest that a defendant presents a threat of violence. Certainly, the belt would indicate that appellant was in custody. But the trial court instructed the jury with CALCRIM No. 103 which states, "You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial. A defendant in a criminal case is presumed to be innocent." The court also gave CALCRIM No. 101, which states, in relevant part, "Your verdict must be based only on the evidence presented during trial in this court and the law as I provide it to you," and "Do not let bias, sympathy, prejudice, or public opinion influence your decision." It is assumed that the jury followed the court's admonitions. (See *People v. Frank* (1990) 51 Cal.3d 718, 728.) For these reasons, we see no reasonable probability that a result more favorable to appellant would have been reached had the trial court instructed the jury to disregard the stealth belt in the determination of appellant's guilt. (See *People v. Jacobs, supra*, 210 Cal.App.3d at p. 1142.)

5. "Criminal history" evidence

Appellant contends the trial court erred in admitting evidence that his DNA was in the CODIS system and permitting the prosecutor to question appellant about his failure to

omission of the restraint instruction lowered the prosecution's burden of proof and rose to the category of federal constitutional error.

18

make a court appearance and to report to his probation officer in the months after the murder. He contends the evidence was highly prejudicial and not probative, and should have been excluded pursuant to Evidence Code section 352. He further contends admission of the evidence violated his federal constitutional rights to trial by jury, a fair trial and due process. We see no abuse of discretion in admitting the evidence and so no violation of appellant's federal constitutional rights.

A trial court has broad discretion under Evidence Code section 352 and its decision that the probative value of the evidence outweighs its prejudicial impact will not be disturbed on appeal unless the court exercised its discretion in "'an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]'" (*People v. Rodrigues, supra,* 8 Cal.4th at p. 1124.)

"The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damages to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. . . . The "prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

We see no abuse of discretion in the trial court's decision to admit the CODIS evidence. The source of the DNA match did have some relevance to show how the investigation was proceeding, and how the investigative lead to appellant began. It also had some potential for prejudice, since CODIS is a Federal Bureau of Investigation database of DNA from criminals. This prejudice was minimized, however, because the database was not described in any detail. It was referred to only by its acronym of CODIS, a innocuous acronym which stands for Combined DNA Index System. There was no suggestion that it was a law enforcement database or that the DNA in the database was obtained from persons in police custody and convicted felons. The jury would have been speculating it if believed that appellant's inclusion in the database showed a "long criminal history" as appellant now contends on appeal. Thus, it was not arbitrary or

19

capricious for the court to find the probative value of the evidence outweighed its potential prejudicial impact. Further, once appellant testified, the jury learned that he was in fact a convicted felon, and so even if the jury somehow guessed CODIS was a law enforcement database, appellant could have suffered no actual prejudice.

We also see no abuse of discretion in the court's decision to permit the prosecutor to question appellant about his failure to report to his probation officer and to appear in court following the murder. Both events supported an inference of consciousness of guilt, albeit a somewhat weak one since they occurred in November, two months after the murder. There was some prejudicial potential, since the events did show that appellant had a prior criminal history. The prejudice was minimal, however, since no details were introduced and probationary status does not suggest a serious crime had occurred. Thus, it was not arbitrary or capricious for the court to find the probative value of the evidence outweighed its potential prejudicial impact. Further, once appellant testified, the jury learned that he was in fact a convicted felon, and so appellant could have suffered no actual prejudice from disclosure of his probationary status.


6. Refusal to dismiss a juror.

Appellant contends the trial court erred in refusing to dismiss a juror who worked at the same store as the victim's brother, David Ramirez. David was a witness in the case. Appellant contends the court's error violated his Sixth Amendment rights and section 1089.

Section 1089 provides for the discharge of a juror "before or after the final submission of the case to the jury" for "good cause" shown. Once the trial court is placed on notice that good cause to discharge a juror may exist, "it is the court's duty 'to make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged. [Citation.]" (*People v. Espinoza* (1992) 3 Cal.4th 806, 821.) A juror's inability to perform "'must appear in the record as a "demonstrable reality" and bias may not be presumed.' [Citations.]" (*People v. Beeler* (1995) 9 Cal.4th 953, 975.)

20

Both the scope of the court's inquiry and the ultimate decision whether to retain or discharge a juror are committed to the sound discretion of the trial court. (*People v. Bonilla* (2007) 41 Cal.4th 313, 350.) If any substantial evidence exists to support the trial court's exercise of its discretion under section 1089, the court's action will be upheld on appeal. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1351.) It will be upheld unless it "'falls outside the bounds of reason.'" (*People v. Kipp* (1998) 18 Cal.4th 349, 371.)

Here, the prosecutor informed the trial court on October 22 that David had told Detective Brown that he worked with Juror No. 8. David did not know the juror's full name. The court held a sidebar with both attorneys and Juror No. 8. When the court asked Juror No. 8 if he knew David from work, Juror No. 8 replied, "Yeah, I think I do." When asked how he knew David, he replied, "I think he works in, like, the meat area where I work at." Juror No. 8 explained that he had "very little contact with barely anybody there except for [his] management team." When it was suggested that he must have some memory of David working in the meat department, Juror No. 8 said, "I mean, there is 500 associates in my area. There is probably, like, 40 or 50 different Davids." When asked when he last interacted with David, Juror No. 8 said, "Because usually on my side of the store, you run into everybody. Maybe Saturday." Other than saying "hi," Juror No. 8 could not recall any conversations that he had engaged in with David, and he said that he did not socialize with him in any way.

Juror No. 8 stated that recognizing David from work would not affect his judgment as a juror, and seeing David at work would not make him feel uncomfortable. Juror No. 8 he understood he could not contact David at work or talk to him about the case. Juror No. 8 added, "I'm not totally a hundred percent sure if it is him or not."

Defense counsel expressed concern that Juror No. 8 had "some sort of knowledge" of David, but the trial court responded, "I don't think, counsel, it rises to the level of excusing him for cause. It appears this relationship appears to be very minimal. At this point, I don't see any reason he can't continue."

We see no abuse of discretion in the trial court's ruling that the relationship was "minimal" and did not provide cause for excusing Juror No.8, and that Juror No. 8 could

remain on the jury. As the above quoted questions and answers show, Juror No. 8's place of employment was large, and he did not work directly with David, had never socialized with him, and was not even sure that David was his coworker. It was more than reasonable for the court to conclude that any slight acquaintance between the two would not produce undue bias. (See *People v. Ray* (1996) 13 Cal.4th 313, 344 [no evidence of bias where evidence showed only that juror taught at same school that victim's daughter attended]; *People v. McPeters* (1992) 2 Cal.4th 1148, 1172 [court did not abuse discretion in retaining juror who had met husband of victim in husband's capacity as real estate agent for seller of house juror was buying; husband was a witness at trial].) We see nothing to support an inference of bias, and bias may not be presumed. (See *People v. Beeler, supra*, 9 Cal.4th at p. 975; *People v. McPeters, supra*, 2 Cal.4th at p. 1175.)

       7. Accomplice instructions

       Appellant contends the trial court erred in failing to instruct the jury that Bernardino was an accomplice as a matter of law. The trial court did instruct the jury that it had to decide whether Bernardino (and Foust) were accomplices. He contends the trial court's error violated his federal constitutional rights under the U.S. Constitution.

       Generally, "[w]hen a jury receives substantial evidence that a witness who has implicated the defendant was an accomplice, a trial court on its own motion must instruct it on the principles regarding accomplice testimony. [Citations.] This includes instructing the jury that an accomplice's testimony implicating the defendant must be viewed with caution and corroborated by other evidence. [Citations.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1223.)

       An accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.) Whether a witness is an accomplice is a factual question for the jury unless the facts are undisputed and support only one inference. (*People v. Brown* (2003) 31 Cal.4th 518, 556-557.) If the facts and the inferences to be drawn from the facts are clear and undisputed, at trial court may take the issue away from the jury and

22

instruct the jury that a witness is an accomplice as a matter of law. (*People v. Williams* (2008) 43 Cal.4th 584, 636.)

Appellant contends nothing could be more "clear and undisputed" than a codefendant already convicted of the crimes for which the defendant is on trial. Appellant has not cited, and we are not aware of, any case holding that a witness who has been convicted separately from a co-perpetrator must be treated as an accomplice as a matter of law when testifying as a witness in the co-perpetrator's trial.

Even if appellant's proposed rule would be appropriate in some cases, the rule is not appropriate in cases like this one, where the witness did not testify at his own earlier trial. Here, even though Bernardino was convicted in the earlier trial, the jury did not make any determination of his credibility in reaching its verdict. In this trial, Bernardino did give his account of the crime, and the jury in this trial was in the best position to determine his credibility. Bernardino claimed that he expected only a fistfight to occur, did not expect the matter to escalate, and did not attempt to save the victim because he was afraid for his own life. Given these facts, which were not before the jury at the first trial, the jury in this matter could have found that Bernardino was not an accomplice. (See *People v. Anderson* (1987) 43 Cal.3d 1104, 1138 [a person is not an accomplice as a matter of law if there is evidence that he acted out of fear of the defendant rather than the necessary criminal intent].)

Appellant's proposed rule also appears incompatible with the reasoning of the California Supreme Court when evaluating acquitted defendants who testify at the trial of another. The California Supreme Court has explained that "'The test is not whether . . . [the alleged accomplice] was subject to trial and conviction *at the time she testified*, but whether, *at the time the acts were committed,* and as a result of those acts, she became "liable to prosecution for the identical offense charged against the defendant."'" (Italics in original.) Therefore, [the alleged accomplice's] previous acquittal did not prevent the jury [in the present case] from finding her to be an accomplice for the purpose of evaluating her testimony under section 1111." (*People v. Gordon* (1973) 10 Cal.3d 460, 469, overruled on another ground by *People v. Ward* (2005) 36 Cal.4th 186, 212.)

23

Thus, the trial court did not err in failing to instruct the jury that Bernardino was an accomplice as a matter of law.  The court correctly instructed the jury to decide whether Bernardino was an accomplice, and that accomplice testimony must be viewed with caution and corroborated by other evidence.

8.  Sufficiency of the evidence for the murder conviction

Appellant contends he at most aided and abetted the kidnapping, or conspired to commit it, and could have been guilty of murder only under a natural and probable consequences theory of liability.  He further contends he withdrew as an aider and abettor and co-conspirator before the murder took place, and so there is insufficient evidence to support his conviction for murder.  He also contends such a conviction violates his federal constitutional right to due process.

a.  Aiding and abetting

"'All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed.'  [Citations.]  Thus, a person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts.  [Citation.]."  (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116-1117, italics in original.)

A person aids and abets the commission of a crime when he, acting (1) with knowledge of the perpetrator's unlawful purpose, and (2) with intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages, or instigates the commission of the crime.  (*People v. Croy* (1985) 41 Cal.3d 1, 11-12; *People v. Beeman* (1984) 35 Cal.3d 547, 561.)  A person must share the specific intent of the direct perpetrator to be guilty of a crime as an aider and abettor.  (*People v. Lee* (2003) 31 Cal.4th 613, 624.)

To withdraw as an aider and abettor, a defendant must notify the other principals of his intention to withdraw from the commission of the intended crime or crimes, and do

24

everything in his power to prevent the crime or crimes from being committed. (*People v. Shelmire* (2005) 130 Cal.App.4th 1044, 1055.) "The withdrawal test is objective. Its first prong is the actual communication of one's intent to withdraw." (*Id*. at pp. 1055-1056.)

There is substantial evidence showing that appellant intended to aid and abet the murder. Appellant acknowledges there is sufficient evidence to support his kidnapping conviction. Before appellant and the others caught up to Nick at the gas station, appellant knew Garcia had a gun. Appellant continued to assist with Nick's kidnapping. During Nick's captivity at Bernardino's house, appellant participated in beating Nick. Appellant acknowledged that he saw Esparza bring the gun from the car into Bernardino's garage at Garcia's request. Appellant said he heard Bernardino make a statement about "taking Nick out to the desert and blasting him" and heard Garcia tell Nick that he would "smoke" him if he did not return the stolen items. Appellant also saw Garcia point his gun at Nick and say, "I'm going to blast you, smoke you." According to Foust, appellant made a similar remark to Nick, stating that "he was going to blast him if he didn't give up the information regarding the stereo equipment." After hearing Garcia's threats to kill Nick, appellant still told Nick to climb into the trunk of the car, cut the straps on Nick's backpack, used the straps to tie Nick hands and used his own t-shirt to gag Nick. According to Bernardino, appellant told Garcia that they would have to go through with "smoking" Nick because they did not want him to tell the police about the beating in the garage.[8]

---

[8]     Appellant contends Bernardino's testimony lacks all credibility because it is inconsistent with Foust's testimony in Bernardino's trial that Bernardino made the statement about killing Nick so that Nick could not go to the police. Bernardino did not testify in his own trial and it was for the jury to decide which witness to believe. Appellant also contends Bernardino lacks credibility because he had "every expectation of leniency" if he inculpated appellant. At most, Bernardino sought to have a family contact visit while in Los Angeles to testify. The jury was aware of this, and was in the best position to assess Bernardino's credibility. Certainly we cannot find Bernardino incredible as a matter of law. Appellant points to this inconsistency, and to an inconsistency between Foust's and Bernardino's account of the gagging of Nick, to argue

25

Appellant claims he withdrew from aiding and abetting when he told Foust to stop the car, then got out and ran away. According to Foust, appellant simply said, "Stop the car." Appellant then got out of the car and ran away. Also according to Foust, after the murder, Garcia told him to drive to appellant's house, where Garcia and Esparza changed clothes before fleeing to Arizona.

The jury could have reasonably found that appellant's statement and acts did not effectively communicate his withdrawal from the conspiracy, particularly given Foust's testimony that Garcia and Esparza went to appellant's house after the murder. (See *People v. Shelmire*, *supra*, 130 Cal.App.4th at p. 1055 [defendant who hung back while codefendants went into the apartment and committed the crime, then waited until they reemerged and fled with them was not entitled to instruction on withdrawal defense because there was no objective evidence that the codefendants understood the conduct as withdrawal]; see also *People v. Jones* (1934) 136 Cal.App. 722, 723-724 [rejecting defendant's claim of withdrawal where defendant committed one robbery with co-conspirators and then drove one co-conspirator to speakeasy which was site of second robbery and murder; after co-conspirator went into speakeasy, defendant left his car and ran away].)[9]

---

that the People improperly pursued factually inconsistent theories in the two trials. (See *In re Sakarias* (2005) 35 Cal.4th 140, 159-160.) We see nothing in the record before us to indicate the prosecutor deliberately omitted evidence from the second trial that was presented in the first trial, as occurred case in *Sakarias*. As we have just discussed, Bernardino did not testify in the first trial. When he testified in this trial, he offered a slightly different account of events than Foust did. It was for the jury to decide which account to believe.

[9] We note there is no evidence of the second prong of the withdrawal test. There is no evidence that appellant made no attempt to stop the murder from being committed. Appellant contends that it would have been impossible to stop the murder, and so he was excused from this requirement. A defendant who waits until shortly before the commission of the crime to attempt a withdrawal takes a risk that he will not be able to effectively withdraw and will be held responsible for the acts of his co-perpetrators. (See *People v. Jones, supra*, 136 Cal.App. at p. 728 [defendant who waited to run away until

26

Further, appellant waited until very shortly before the murder to leave the car. A defendant who waits until shortly before the commission of the crime to attempt a withdrawal takes a risk that he will not be able to effectively withdraw and will be held responsible for the acts of his co-defendants. (See *People v. Jones, supra*, 136 Cal.App. at p. 728 [defendant who waited to run away until co-defendants entered site of second robbery "had gone too far in aiding and abetting the common undertaking" to benefit from withdrawal defense].)

Since there was evidence that appellant did not effectively withdraw from being an aider and abettor, there is sufficient evidence to support his conviction for murder on an aiding and abetting theory.

b. Conspiracy

A conspiracy is an agreement by two or more people to commit a crime. (§ 182, subd. (a); *People v. Jurado* (2006) 38 Cal.4th 72, 130.) A conspiracy conviction requires proof of an agreement between two or more people who have the specific intent to agree or conspire to commit an offense, and the specific intent to commit that offense. Further, one or more of the parties to the agreement must commit an overt act for the purpose of carrying out the object of the conspiracy. (*People v. Morante* (1999) 20 Cal.4th 403, 416.) Accordingly, a conviction for conspiracy to commit murder requires a finding of intent to kill. (*People v. Swain* (1996) 12 Cal.4th 593, 607.)

A criminal conspiracy may be shown by direct or circumstantial evidence that the parties came to a mutual understanding to accomplish the act. (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1025.) Thus, "a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." (*People v. Rodrigues*, *supra*, 8 Cal.4th at p. 1135.) A person may join a previously formed conspiracy by actively participating in it with the same intent as the original conspirators. (*People v. Aday* (1964) 226 Cal.App.2d 520, 534.)

co-defendants entered site of second robbery "had gone too far in aiding and abetting the common undertaking" to benefit from withdrawal defense]. )

27

The same evidence which is sufficient to show that appellant aided and abetted the murder is also sufficient to show that he was a co-conspirator in the murder.

"Withdrawal from a conspiracy requires 'an affirmative and bona fide rejection or repudiation of the conspiracy, communicated to the coconspirators. [Citations.]'" (*People v. Sconce* (1991) 228 Cal.App.3d 693, 701, quoting *People v. Crosby* (1962) 58 Cal.2d 713, 730-731.) "'Generally, a defendant's mere failure to continue previously active participation in a conspiracy is not enough to constitute withdrawal. . . . Once the defendant's participation in the conspiracy is shown, it will be presumed to continue unless he is able to prove, as a matter of defense, that he effectively withdrew from the conspiracy.'" (*People v. Lowery* (1988) 200 Cal.App.3d 1207, 1220.)

As we discuss, *supra*, a jury could reasonably find that appellant's exit from the car did not effectively communicate his withdrawal from aiding and abetting. For the same reasons, a jury could reasonably have found that appellant did not effectively communicate his intent to withdraw from the conspiracy. Further, appellant communicated his intent to at most Foust and Esparza. Foust testified there was no discussion of appellant's departure after appellant got out of the car. There was nothing to show that Garcia and Bernardino were even aware that appellant was no longer with them, let alone of the reason for appellant's departure. (See *Loser v. Superior Court* (1947) 78 Cal.App.2d 30, 32 [at most evidence showed intent to withdraw was communicated to only one of several co-conspirators and so evidence did not compel the conclusion that defendant had effectively withdrawn from the conspiracy prior to the commission of the substantive offenses].)

c. Prosecutorial misconduct

Appellant contends that the prosecutor made misleading arguments regarding appellant's withdrawal defense during closing argument. Appellant did not object to the prosecutor's statements and so has forfeited this claim on appeal. (*People v. Hill, supra*, 17 Cal.4th at p. 820.)

28

d.  Federal constitutional claim

"If we determine that a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt, the due process clause of the United States Constitution is satisfied [citation] as is the due process clause of article I, section 15 of the California Constitution."  (*People v. Osband* (1996) 13 Cal.4th 622, 690.)  Here, we have found that a rational trier of fact could have found that appellant did not effectively withdraw from aiding and abetting and the conspiracy.  The due process clauses of the federal and California constitutions are satisfied.

9.  Cumulative error

Appellant contends that even if the errors in this case considered individually do not require reversal, the cumulative effect of those errors was prejudicial, denied him due process, and requires reversal.  We do not agree.

Individual errors which are not prejudicial when considered separately may be prejudicial if considered cumulatively.  (*People v. Hill*, *supra*, 17 Cal.4th at p. 844.)  Cumulative error may so "infect[] the trial with unfairness as to make the resulting conviction a denial of due process."  (*Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 642-643.)

We have found only one error in this case, the failure of the trial court to instruct sua sponte on restraints.  There can be no cumulative error in such a circumstance.

10.  *Romero*[10] motion

Appellant contends the trial court abused its discretion in refusing to strike his prior strike conviction for assault with a deadly weapon.  We see no abuse of discretion.

Rulings on motions to strike prior convictions are reviewed under the deferential abuse of discretion standard.  Under that standard an appellant who seeks reversal must demonstrate that the trial court's decision was irrational or arbitrary.  It is not enough to

---

[10]     *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

show that reasonable people might disagree about whether to strike one or more of his prior convictions. Where the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling. (*People v. Carmony* (2004) 33 Cal.4th 367, 373.)

In deciding whether to dismiss a prior strike conviction, the trial court must consider whether the defendant falls outside the spirit of that law, and whether the dismissal is therefore "in furtherance of justice." (*People v. Williams* (1998) 17 Cal.4th 148, 158-161.) The court must consider "whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams, supra,* 17 Cal.4th at p. 161.)

Appellant contends there were numerous mitigating factors supporting striking his prior conviction: the victim in that conviction was "not without fault," his criminal history was not extensive, his criminal conduct took place in an 18 month period which was followed by four years without arrests or convictions, most of his "problems with the law" were related to substance abuse and he was not a "principal actor" in Nick's murder. He claims it is unfair to punish him more severely than co-defendant Garcia, who he views as more culpable.

The prosecutor disputed appellant's account of his prior conviction, pointed out that both appellant's past and current convictions were violent offenses, and noted appellant had been recently released from jail and was on probation when he committed the offenses in this case.

The court read both parties' briefs and the probation report. At the hearing on this matter stated that according to appellant's probation report, he has started smoking marijuana at age 11 and using methamphetamine two years later, but it did not appear that appellant had taken any steps to try to get help for his drug problems. The court

found that appellant's criminal history, violence, poor performance on probation compelled the court to deny appellant's motion,

At most, appellant has shown that reasonable people might disagree about whether his prior strike conviction should be dismissed. This is not enough. (*People v. Myers* (1999) 69 Cal.App.4th 305, 310.) Appellant has not shown that the trial court's decision was "so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony, supra,* 33 Cal.4th at p. 377.)

The trial court's comments indicate that it properly considered the nature and circumstances of appellant's current and prior convictions and the particulars of his background, character and prospects, and reached an impartial decision. (*People v. Williams*, *supra*, 17 Cal.4th at pp. 161-164.) Thus, the trial court did not abuse its discretion and we must "affirm the trial court's ruling even if we might have ruled differently in the first instance." (*People v. Myers, supra,* 69 Cal.App.4th at p. 310.)

11. Presentence custody credits

Appellant contends the trial court awarded him a total of 1508 days of custody credit, but the abstract of judgment incorrectly reflects only 792 days of presentence custody credit. We agree in part.

Appellant was entitled to 792 days of actual custody credit in case MA037295 for the period from his arrest on February 23, 2011 through his sentencing date on April 24, 2013. Since appellant was convicted of murder, he was not entitled to good time or work time credit. (§ 2933.2.) To the extent the trial court awarded appellant 396 days of such credit, the trial court erred.

Appellant was sentenced to a one-year term in case MA033978 for the offense for which he was on probation at the time of the murder. The term was ordered to run consecutively to the sentence in the murder case. The trial court found that appellant had 320 days of credit for that offense. Appellant is entitled to that credit. The abstract of judgment contained in the record on appeal shows only the sentence for the murder and kidnapping cases, however.

31

Appellant suggests that we order the trial court to prepare an abstract of judgment in case MA033978 reflecting the 320 days of custody credit, or in the alternative order the court to prepare a joint abstract reflecting both cases numbers and including the 320 days of custody credit. Appellant did not file a notice of appeal in case number MA033978. Accordingly, appellant should seek any necessary corrections in that case in the trial court.

Disposition

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MINK, J.[*]

We concur:

MOSK, ACTING P. J.

KRIEGLER, J.

---

[*]  Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.